# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

## HOME DEPOT U.S.A., INC.,

*Petitioner/Cross-Respondent*,

*v.*

## NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

ON PETITION FOR REVIEW
AND CROSS-APPLICATION FOR ENFORCEMENT
OF A FINAL ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
CASE NO. 18-CA-273796

## REPLY BRIEF FOR PETITIONER/CROSS-RESPONDENT
## HOME DEPOT U.S.A., INC.

C. Thomas Davis
Keith D. Frazier
Brian E. Hayes
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
401 Commerce Street
Suite 1200
Nashville, TN 37219
(615) 254-1900

Roman Martinez
Brent T. Murphy
Joseph E. Sitzmann
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for Petitioner/Cross-Respondent Home Depot U.S.A., Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................. 1

ARGUMENT ........................................................................................ 2

I.      THE BOARD'S NLRA ARGUMENTS FAIL ................................... 2

      A.     Bo's BLM Display Was Not For "Mutual Aid Or Protection" ............ 3

      B.     Bo's BLM Display Was Not "Concerted" .......................................... 10

      C.     Home Depot Had Legitimate Business Justifications For Enforcing Its Apron Policy ................................................................. 12

II.     THE BOARD'S FIRST AMENDMENT ARGUMENTS FAIL ................. 18

      A.     *NetChoice* Confirms That The First Amendment Protects Home Depot's Apron Policy ............................................................. 19

      B.     *Janus* And *Wooley* Likewise Support Home Depot .......................... 23

      C.     The Board's "Decades Of Precedent" Argument Lacks Merit .......... 26

III.    THE BOARD'S CEASE-AND-DESIST ORDER IS TOO BROAD ........... 28

CONCLUSION ................................................................................... 30

Appellate Case: 24-1513   Page: 2   Date Filed: 09/03/2024 Entry ID: 5431163

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*800 River Road Operating Co. LLC v. NLRB*,
  784 F.3d 902 (3d Cir. 2015) ...............................................................13

*Amalgamated Transit Union Local 85 v. Port Authority of Allegheny County*,
  39 F.4th 95 (3d Cir. 2022) .................................................................24

*AMCAR Division, AFC Industries, Inc. v. NLRB*,
  596 F.2d 1344 (8th Cir. 1979) .....................................................28, 29

*Ampersand Publishing, LLC v. NLRB*,
  702 F.3d 51 (D.C. Cir. 2012) ...............................................................8

*Brown v. Entertainment Merchants Association*,
  564 U.S. 786 (2011)...........................................................................27

*Eastex, Inc. v. NLRB*,
  437 U.S. 556 (1978)...................................................................3, 4, 12

*Epic Systems Corp. v. Lewis*,
  584 U.S. 497 (2018).................................................................2, 349 3

*Fabri-Tek, Inc. v. NLRB*,
  352 F.2d 577 (8th Cir. 1965) .............................................................14

*Five Star Transportation, Inc.*,
  349 NLRB 42 (2007) .............................................................................6

*Hurley v. Irish-Amercian Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995)...........................................................19, 20, 21

*Janus v. AFSCME*,
  585 U.S. 878 (2018)......................................................................16, 24

*Lion Elastomers, L.L.C. v. NLRB*,
  108 F.4th 252 (5th Cir. 2024) ...........................................................28

ii

*Loper Bright Enterprises v. Raimondo,*
144 S. Ct. 2244 (2024)............................................................................3

*Mader v. United States,*
654 F.3d 794 (8th Cir. 2011) .............................................................29

*Moody v. NetChoice, LLC,*
144 S. Ct. 2383 (2024)..............................................................*passim*

*Morrison Cafeterias Consolidated, Inc. v. NLRB,*
431 F.2d 254 (8th Cir. 1970) .............................................................12

*Nichols Aluminum, LLC v. NLRB,*
797 F.3d 548 (8th Cir. 2015) ...............................................................7

*NLRB v. Air Contact Transport Inc.,*
403 F.3d 206 (4th Cir. 2005) .............................................................13

*NLRB v. City Disposal Systems Inc.,*
465 U.S. 822 (1984)............................................................................10

*NLRB v. Local 282, International Brotherhood of Teamsters,*
412 F.2d 334 (2d Cir. 1969) ..............................................................29

*NLRB v. Main Street Terrace Care Center,*
218 F.3d 531 (6th Cir. 2000) .............................................................13

*NLRB v. Starbucks Corp.,*
679 F.3d 70 (2d Cir. 2012) ................................................................14

*Pacific Gas & Electric Co. v. Public Utilities Commission of California,*
475 U.S. 1 (1986)................................................................................23

*Pathmark Stores, Inc.,*
342 NLRB 378 (2004) ........................................................................18

*Peyton Packing Co.,*
49 NLRB 828 (1943) ..........................................................................13

*PruneYard Shopping Center v. Robins,*
447 U.S. 74 (1980)..............................................................................22

Appellate Case: 24-1513     Page: 4     Date Filed: 09/03/2024 Entry ID: 5431163

**Page(s)**

*Republic Aviation Corp. v. NLRB*,
    324 U.S. 793 (1945)......................................................................12, 14

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)..............................................................................22

*SFR, Inc.*,
    373 N.L.R.B. No. 84 (Aug. 21, 2024) ......................................4, 5, 13

*Southern New England Telephone Co. v. NLRB*,
    793 F.3d 93 (D.C. Cir. 2015).....................................................13, 16, 18

*St. Paul Park Refining Co. v. NLRB*,
    929 F.3d 610 (8th Cir. 2019) ............................................................11

*Textile Workers Union of America v. Darlington Manufacturing Co.*,
    380 U.S. 263 (1965)............................................................................12

*Tradesmen International, Inc. v. NLRB*,
    275 F.3d 1137 (D.C. Cir. 2002)...............................................4, 5, 6, 9

*United States v. Northeastern Pharmaceutical & Chemical Co.*,
    810 F.2d 726 (8th Cir. 1986) ............................................................19

*United States v. Roberts*,
    881 F.3d 1049 (8th Cir. 2018) ..........................................................28

*Venetian Casino Resort, L.L.C. v. NLRB*,
    484 F.3d 601 (D.C. Cir. 2007)........................................................4, 9

*Waters of Orchard Park*,
    341 NLRB 642 (2004) ........................................................................6

*Wickersham v. City of Columbia*,
    481 F.3d 591 (8th Cir. 2007) ............................................................22

*Wooley v. Maynard*,
    430 U.S. 705 (1977)......................................................................23, 25

**STATUTES**

29 U.S.C. § 157 ......................................................................................2

iv

|  | Page(s) |
|---|---|
| 29 U.S.C. § 160(e) | 28, 29 |
| 29 C.F.R. § 102.48(c)(3) | 28 |

## OTHER AUTHORITIES

Guideline Memorandum Concerning Unfair Labor Practice Charges
Involving Political Advocacy, No. GC 08-10, 2008 WL 6708138
(N.L.R.B.G.C. July 22, 2008) ..........................................................3, 4

Appellate Case: 24-1513   Page: 6   Date Filed: 09/03/2024 Entry ID: 5431163

# INTRODUCTION

Home Depot indisputably uses its iconic orange aprons to communicate expressive messages to the public. The Board cannot deny that "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2401 (2024). Nonetheless, the Board insists that the National Labor Relations Act required Home Depot to permit Bo's personal ideological message on a company apron—even though Home Depot's lawful written policy prohibits such messages, and even though the message was closely associated with an ongoing public controversy. The Board is wrong on multiple fronts.

*First*, the Board misinterprets the NLRA. That law applies only when workers join together to improve their employment conditions. It does not let on-the-job employees unilaterally display ideological messages with non-existent (or at most highly attenuated) connections to the workplace. Here, the evidence makes clear that Bo's Black Lives Matter display was a general show of support for Black people prompted by George Floyd's recent murder mere miles away. That highly charged environment reinforced Home Depot's compelling business reasons for prohibiting its employees from displaying controversial slogans like Black Lives Matter and

1

Blue Live Matter on their aprons. The Board insists otherwise only by misconstruing the NLRA and ignoring the realities on the ground.

*Second*, the Board tries to avoid First Amendment scrutiny of its expansive NLRA theory by insisting that "this case does not involve Home Depot's speech." Respondent/Cross-Petitioner's Answering Brief ("RAB") 48. That's flat wrong. Under binding precedent—including the Supreme Court's recent *NetChoice* decision—the First Amendment protects Home Depot's expressive choices as to the messages it conveys to customers on its aprons. The Board's claim that "decades of precedent" forecloses Home Depot's First Amendment argument is also incorrect, RAB47, as none of the Board's cases mentions the First Amendment. And the Board does not even try to satisfy strict scrutiny.

For any—or all—of these reasons, the Board's order cannot stand.

## ARGUMENT

## I.    THE BOARD'S NLRA ARGUMENTS FAIL

The NLRA protects employees' rights to: (1) form "labor organizations," (2) "bargain collectively," and (3) engage in "other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The third "catchall term" has limits. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018). "[L]ike the terms that precede it," the catchall protects what employees do while "exercising their right to free association in the workplace" as to labor

2

activities. *Id.* The statute does not reach anything and everything that happens at, or vaguely relates to, the workplace. Here, Bo's BLM display—a self-described "symbol of solidarity" with victims of "prejudice and racism in our world today," App.43/R.68—was neither for mutual aid or protection, nor concerted. And Home Depot had ample business justifications for enforcing its apron policy in any event.[1]

## A. Bo's BLM Display Was Not For "Mutual Aid Or Protection"

1. The Board acknowledges that Section 7's mutual-protection requirement demands a "nexus" between Bo's BLM display and employment conditions. RAB21-22. That standard has teeth. The nexus cannot be "attenuated." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 567-68 (1978). Indeed, the Board's own General Counsel has conceded that for "political advocacy" to qualify for Section 7 protection, the connection must be especially "direct." Guideline Mem. Concerning Unfair Labor Practice Charges Involving Political Advocacy, No. GC 08-10, 2008 WL 6708138, at *3 (N.L.R.B.G.C. July 22, 2008) ("2008 GC Opinion"). The Board describes that guidance as "not binding," RAB33 n.6, but offers no reason to reject its substantive analysis, which has never been withdrawn.

---

[1] The Board does not deny that its legal conclusions are reviewed de novo, RAB9-10, a standard only strengthened by the Supreme Court's recent holding in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024); *see id.* at 2305-06 (Kagan, J., dissenting).

Appellate Case: 24-1513    Page: 9    Date Filed: 09/03/2024 Entry ID: 5431163

Contrary to the Board, Home Depot's argument is not that Section 7 requires a nexus to a "specific dispute" or "specific demand" about the workplace—or that the statute never protects "activity that could be characterized as 'political.'" RAB32. Home Depot's point is that "the substance of [an employee's] appeals" must be "directly related to employee working conditions." 2008 GC Opinion at *2; *accord Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141-43 (D.C. Cir. 2002).

Many political activities satisfy that standard, including "distributing literature regarding minimum-wage legislation" and "wearing pins opposing a ballot initiative regarding union dues." RAB30. But others, like expressing support for a "political candidate" or "urging participation" in a political movement do not. *Eastex*, 437 U.S. 568 n.18. That's true even though such messages "may have an ultimate effect on employment conditions." *Id.*; *see* Retail Litigation Center ("RLC") Amicus Br. 14.

2. Here, Bo's BLM display lacked any "clear and distinct" nexus to working conditions. *Venetian Casino Resort, L.L.C. v. NLRB*, 484 F.3d 601, 607-08 (D.C. Cir. 2007). The Board does not dispute—and in fact recently acknowledged— that BLM's "primary focus" is "police misconduct [against] African Americans," with a secondary emphasis on "all forms of racial injustice" more generally. *SFR, Inc.*, 373 N.L.R.B. No. 84, at 4 (Aug. 21, 2024). Rather, the Board claims that "the circumstances in which that phrase appeared in this case" imbued Bo's BLM display

4

with a special meaning related to the Gumm and Black History Month incidents. RAB26. But the prevailing understanding of BLM, which does not concern "working conditions," is a salient circumstance here. *Tradesmen*, 275 F.3d at 1143. So too is the reality that the events at issue occurred within *seven miles* of George Floyd's murder, at the height of ensuing unrest. This critical context cannot be brushed aside. Coalition for a Democratic Workplace ("CDW") Amicus Br. 16. In light of it, the Board needs powerful evidence of a direct "connection between the BLM [display] *in this case* and [workplace] concerns." *SFR*, 373 N.L.R.B. No. 84, at 4 (emphasis added). That evidence is missing.

a. Most crucially, "[n]o one" at the hearing "testified that they understood [Bo's] display of the BLM message to relate to Gumm's conduct, the vandalism, or any other [workplace] complaints." App.863/R.2196. When asked to explain the BLM display, Bo did not mention Gumm or vandalism. App.212-13/R.237-38. Instead, Bo wanted people to "understand" that "their lives matter, specifically black people," because "they have been the main source of prejudice, racism in history." *Id.* In other words, Bo wanted "to support the community" and "people of color" during an especially trying time in American race relations. App.184/R.209.

The Board musters nothing from Bo's testimony connecting the BLM display with the Gumm or vandalism incidents. Its sole attempt is to claim Bo said that the BLM display was "a signal to such customers that they could approach Bo and not

5

face harassment on account of their race." RAB25. But in that testimony, Bo discussed wanting to express "solidarity" given "prejudice and racism" generally. App.43/R.68. Bo did not mention Gumm, much less her treatment of customers or associates. In any event, seeking to reassure *customers* is "not an effort to improve" the "working conditions" of *employees*. *Tradesmen*, 275 F.3d at 1143; *see Waters of Orchard Park*, 341 NLRB 642, 644 (2004) (nurses advocating for patients unprotected); *Five Star Transp., Inc.*, 349 NLRB 42, 46-47 (2007) (bus drivers advocating for passengers unprotected).

Nor does any other testimony suggest a link between the BLM display and workplace conditions. When asked, "What does Black Lives Matter mean *to you*," Ward discussed "bring[ing] to light systematic injustices and systems of oppression[]." App.263-64/R.338-39 (emphasis added). And Ward's agreement that BLM "could mean different things to different people" obviously does not establish any nexus to workplace issues. App.280/R.371; *contra* RAB28. As for Tesfaldet's testimony that he, like Bo, displayed BLM to "sympathize" with the "stress and high emotions for customers" after "the fresh murder of [George] Floyd," App.301/R.419, the Board says that attempting "to connect with" customers was "part of his job duties," RAB28. But sympathizing with customers is not NLRA-protected activity.

6

The ALJ's hearing gave Bo and other witnesses every opportunity to connect the BLM display with Gumm or the vandalism. It would have been easy enough for someone to claim that link. Nobody did.

b. Without testimonial evidence, the Board tries to manufacture a nexus by cherry-picking statements from Bo's meeting with Belford. RAB24-25. In doing so, it improperly relies on "surmise, implications, [and] plainly incredible evidence." *Nichols Aluminum, LLC v. NLRB*, 797 F.3d 548, 553 (8th Cir. 2015).

The Board ignores its concession below that Bo "did not explicitly connect BLM to any particular incident with Gumm." App.863/R.2196 (quoting General Counsel's brief). That concession was correct. When Belford directly asked Bo "why you put [BLM] on your apron," Bo responded: "I put it on as a signal to show that I support black people; I support people of color. And I think that what happened over the course of the summer"—i.e., Floyd's murder and ensuing protests—"needs to be addressed." App.463/R.1128. Bo did not, as the Board misleadingly asserts, merely "acknowledge[]" that BLM "could serve multiple purposes." RAB28. Rather, Bo confirmed using BLM in its ordinary sense.

The Board's observation that "[i]mproving terms and conditions of employment need not be the only goal of [protected] activity" thus misses the point, which is the Board's failure to establish any NLRA-protected purpose in the first place. RAB22. The single unmistakable "focus" of Bo's BLM display was showing

7

support and solidarity with people of color after Floyd's murder. *Ampersand Publ'g,*

*LLC v. NLRB*, 702 F.3d 51, 58 (D.C. Cir. 2012).

Nothing else in the Belford conversation changes that reality. The Board relies heavily on Bo's answer to Belford's own question whether there was "any other way that you could show your support for people of color *or black associates*." App.477/R.1142 (emphasis added); *see* RAB24. And it similarly banks on Belford's request that Bo "find another cool way to support Black Lives Matter" and "to appreciate your associates." App.492/R.1157; *see* RAB25. But the Board has no rejoinder to the fact that these generalized exchanges about support for fellow associates lack any clear nexus to Gumm or the Black History Month vandalism. Petitioner/Cross-Respondent's Opening Brief ("POB") 31; *see* RAB24. Rather, they match Bo's hearing testimony about wanting to "show [BLM] as a symbol of solidarity" with "coworkers and customers" given the prevalence of "prejudice and racism" generally, which drew no connection to the store. App.43/R.68.

The Board next asserts that Bo told Belford that Bo's "continued display of 'BLM' was important" because the Black History Month decorations vandalized in February 2021 were "a different means of supporting Black employees at the store and had been torn down." RAB25. But Bo said only that Bo was "not seeing" any "alternative" way "to celebrate black leaders or associates of color" apart from

8

displaying BLM.  App.487/R.1152.  Bo never said that the BLM display, which predated the vandalism by several months, was meant to protest that incident.  *Id.*

The Board similarly errs in citing Bo's statement about "leading a great example by refusing to remove BLM."  RAB25 (quoting App.486/R.1151).  This statement did not link the BLM display to the Gumm or vandalism incidents, so the Board instead argues that Bo's emphasis on the purported "impact of [Bo's] conduct on other employees" *itself* triggers NLRA protection.  *Id.* (citing App.486/R.1151). But setting an example for coworkers does not trigger the NLRA.  Here too, the Court should reject the Board's "sweeping and unprecedented expansion" of Section 7.  *Tradesmen*, 275 F.3d at 1143.

Finally, the Board contends Bo articulated a link between the BLM display and the Gumm situation by telling Belford, "It's been six months, and nothing has been done."  App.480/R.1145; *see* RAB18.  But Belford immediately clarified that the Gumm situation was "a completely separate issue from you having [BLM] on your apron"—and Bo did not disagree.  App.480/R.1145.  The Board asserts that Bo's non-response "means little" in the context of "a 90-minute conversation." RAB28.  But Bo's silence underscores everyone's understanding that the BLM display's "central message" concerned racism and injustice generally, not Gumm or the New Brighton store specifically.  *Venetian Casino*, 484 F.3d at 607-08.

9

3. The Board has no good answer for the sweeping consequences of its NLRA interpretation. POB22-23. It claims Section 7 has "its own limiting principle" because messages displayed by employees "must relate to terms and conditions of employment." RAB30. But that's no limit at all under the Board's expansive Section 7 theory, which would protect myriad other political messages, such as "Stop Immigration Now" or "Abortion Is Healthcare." POB22-23 (giving examples); *see* CDW Amicus Br. 18-19. Indeed, the Board effectively confirms that, under its view of Section 7, most of Home Depot's examples qualify as "connected to working conditions." RAB31 & n.5. That concession shows just how far the Board is straying from the NLRA's text and purpose.

### B. Bo's BLM Display Was Not "Concerted"

The Board acknowledges its burden to show that Bo's BLM display was "concerted." RAB12. But Bo's unilateral decision to display BLM was not "linked to the actions of fellow employees," as that independent statutory requirement demands. *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 830-31 (1984); *see* POB32-34; Chamber of Commerce Amicus Br. 21-28.

The Board concedes that "other employees had not approved or discussed" Bo's BLM display. RAB20. Nevertheless, the Board says "concerted activity does 'not require evidence of formal authorization,' or 'express discussion.'" *Id.* That misses the point. Nothing suggests even *informal* authorization or an *implicit*

10

understanding tying Bo's display to anyone else's conduct. POB32-33. Bo chose to display BLM on Bo's own accord, just as Bo separately chose to display "Halloween decorations" and "santa hats." App.38-40/R.63-65.

Tellingly, the Board does not claim that Bo's "initial act of writing 'BLM' on their apron qualified as concerted"—because it obviously does not. RAB19-20. The Board instead contends that Bo's BLM display *became* concerted at some point "over the months leading up to February [2021]," such that Bo's "later insistence on retaining it" was a concerted act. *Id.* That strained theory fails.

The Board invokes the "logical outgrowth" doctrine, arguing that Bo's refusal to remove the BLM display grew out of employees' complaints related to the Gumm and vandalism incidents. *Id.* at 17-19. But Bo never drew that connection. *Supra* 5-10. And the Board's own lead case underscores how far the Board is stretching this doctrine. In *St. Paul Park Refining Co. v. NLRB*, 929 F.3d 610 (8th Cir. 2019), two employees met with management to "express[] concerns about [workplace] safety"; later that day, one of those employees "repeatedly called for a safety stop" and "refus[ed] to work." *Id.* at 616. The close connection between the individual and group activities in *St. Paul Park* was unmistakable. *Id.* Not so here.

The Board also argues that "Bo brought truly group complaints to management by refusing to remove 'BLM,'" on the theory that the display "served as an ongoing visual reminder that kept management's attention on the

11

racial-discrimination issues that employees believed Home Depot had failed to address effectively." RAB19. That theory is fictional: Bo never said the BLM display was a *group* complaint geared to *management*. Instead, Bo consistently characterized it as Bo's own general expression of support for Black people, including "coworkers and customers." App.43/R.68.

Finally, the Board notes that Bo's conversation with Belford covered both the BLM display and "the prior group complaints about Gumm and the Black History Month vandalism." RAB21. That proves nothing. The meeting addressed multiple distinct topics. POB11-12. That does not convert Bo's unilateral display of BLM into concerted action.

### C. Home Depot Had Legitimate Business Justifications For Enforcing Its Apron Policy

Under *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263 (1965), NLRA Section 8 is not "violated" unless the employer's asserted "interference with [Section 7] rights outweighs the business justification for the employer's action." *Id.* at 269. *Darlington* thus "recognizes the need to balance employer and employee rights" before finding a violation. *Morrison Cafeterias Consol., Inc. v. NLRB*, 431 F.2d 254, 257 (8th Cir. 1970); *see Eastex*, 437 U.S. at 570-74 (balancing interests). And when an employer "mak[es] and enforc[es] reasonable rules covering the conduct of employees on company time," such rules are "presumed to be valid." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803

Appellate Case: 24-1513     Page: 18     Date Filed: 09/03/2024 Entry ID: 5431163

n.10 (1945) (approvingly quoting *Peyton Packing Co.*, 49 NLRB 828, 843 (1943)). As the Board itself recently recognized, employers have legitimate business justification for "prohibiting all sorts of divisive activity from their workplaces," particularly activities that "are at best tangentially related to [workplace] concerns." *SFR*, 373 N.L.R.B. No. 84, at 4. These principles confirm that Home Depot lawfully enforced its apron policy.

1. Ignoring *Darlington*, the Board resists the idea that the NLRA "always balances interference with employee rights and an employer's justification." RAB37 n.9. But Supreme Court instructions are not optional, and *Darlington*'s test applies across the board. *See NLRB v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 538 & n.2 (6th Cir. 2000) (wage discussions); *800 River Rd. Operating Co. LLC v. NLRB*, 784 F.3d 902, 915 n.6 (3d Cir. 2015) (internal investigation); *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 214 n.2 (4th Cir. 2005) (employee reprimand).

This case is no exception. While some courts ask whether "special circumstances" justify restricting otherwise protected employee activities, RAB35-37, the key point remains: Section 7 rights are not absolute, and an employer's business justifications can outweigh the employee's interests. *See S. New England Tel. Co. v. NLRB*, 793 F.3d 93, 97 (D.C. Cir. 2015) (Kavanaugh, J.) ("balance" weighed in employer's favor when applying "ban on unprofessional clothing" to employee T-shirts criticizing management).

13

The Board similarly errs in asserting that under *Republic Aviation*, only working time restrictions on "solicitation"—not on "insignia or apparel"—are "presumptively valid." RAB37. Although *Republic Aviation* involved an employer's anti-solicitation rule, it framed the presumption of validity more broadly, covering *any* "reasonable rules covering the conduct of employees on company time." 324 U.S. at 803 n.10. That includes commonsense restrictions on what on-the-job employees say to customers.

The Board counters that "employees do have the right to wear *union insignia* during working time." RAB37 (emphasis added) (quoting *Fabri-Tek, Inc. v. NLRB*, 352 F.2d 577, 584 (8th Cir. 1965)). But Bo did not display union insignia (which implicate core NLRA labor concerns), so any exception to *Republic Aviation*'s presumption for "customary [union] buttons" is irrelevant. *Fabri-Tek*, 352 F.2d at 585. In any event, *Fabri-Tek* recognized that "an employer can prohibit or regulate the wearing of [even] union insignia" when business justifications (i.e., special circumstances) warrant it. *Id.*; *see NLRB v. Starbucks Corp.*, 679 F.3d 70, 77-78 (2d Cir. 2012) (upholding employer restriction on union buttons). If so, Home Depot can surely prohibit employees from trumpeting controversial slogans tied to workplace issues only loosely (if at all).

2. Home Depot had three manifestly reasonable business justifications for its apron policy: (1) protecting its apolitical public image, (2) preserving workplace

harmony, and (3) promoting employee and customer safety. POB36-43. All three interests were especially salient in Minneapolis during the widespread unrest following George Floyd's murder. *Id.* The Board's counterarguments fail.

a. The Board says there is no "record support" for Home Depot's desire to communicate an "apolitical" image to customers. RAB40. That ignores the very Home Depot apron policy at the heart of this case, which bars "political messages unrelated to workplace matters," among other potentially divisive messages. App.789/R.1907. It also disregards Home Depot's own statements on each apron, including the "Values Wheel" and other apolitical company slogans. POB4-7.

The Board notes that Home Depot "celebrates and publicizes employees' custom variations" of company aprons. RAB38. Yes, but any personalization is carefully circumscribed by Home Depot's no-politics policy. Within Home Depot's approved boundaries, personalization furthers the company's expressive goals of celebrating employees' individuality and fostering a warm store environment. POB6-7, 20-21.

The Board notes that Home Depot "allows employees to wear LGBTQ-pride symbols and Diversity, Equity, and Inclusion pins." RAB39. But Home Depot has every right to select which personalized displays advance its message and which do not. *Infra* 18-23. The Board cannot constitutionally second-guess Home Depot's expressive choices, and the NLRA does not "somehow estop[]" Home Depot from

15

prohibiting BLM and Blue Lives Matter just because "on some occasions [it] has allowed" other arguably controversial messages in different circumstances. *S. New England*, 793 F.3d at 97; *see* CDW Amicus Br. 20. Moreover, Home Depot's enforcement of its apron policy here was especially reasonable given (1) the unrest roiling Minneapolis after George Floyd's murder and (2) Home Depot's evenhanded ban on opposing messages. App.809/R.1948.

The Board also says the BLM display lacked "the appearance of an official company message," so customers would not assume Home Depot endorsed it. RAB40. But the Board ignores the many reasons that's wrong—i.e., Home Depot indisputably relies on the apron to communicate with customers, Bo wore the apron while interacting with customers, and both Bo and Tesfaldet recognized that customers *would* assume that Home Depot endorses or condones messages displayed on its uniforms. POB40-41. The Supreme Court's commonsense observation bears repeating: When an "employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer." *Janus v. AFSCME*, 585 U.S. 878, 910 (2018). Home Depot could therefore prohibit Bo's

16

BLM display (and other employees' pro-police displays) to protect its non-political public image in a deeply fraught environment.[2]

b. What the Board euphemistically calls "recent events in Minneapolis," RAB46, also created substantial risks to workplace harmony and customer and employee safety. *See* POB40-43 (citing evidence); App.347-48/R.674-75, App.278-79/R.365-66. Given the highly charged environment, the Board is wrong to dismiss this proof as generic "employee complaints." RAB46. Indeed, the Board fails to acknowledge that Belford had to prohibit another employee from wearing a "Thin Blue Line pin" in "support of his son," a "police officer that was responsible for protecting" Chauvin's home pending his trial for Floyd's murder. App.352-53/R.684-85. That employee "was very concerned about [his son's] safety," given the ongoing "protests" and "riots." App.352/R.684. Home Depot responsibly chose to prohibit all displays associated with the controversy. POB42.

Home Depot also sensibly accounted for dangers to employees and customers. The Board relies on the lack of actual "customer-employee confrontations over any message or image on a New Brighton employee's apron." RAB44. But "evidence

---

[2] Although union insignia are sometimes treated differently, RAB40-41, that's likely because (1) such insignia obviously reflect employees' own affiliation and (2) supporting unionization is a core NLRA policy that carries more weight in *Darlington*'s balancing analysis. More generic ideological messages like BLM are not remotely analogous in either respect.

17

of actual harm" is not required. *Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004); *accord S. New England*, 793 F.3d at 96. And the "environment" around the New Brighton store was "violent enough" that management had to take other steps to "protect [Home Depot] associates," including closing the store six different times. App.349/R.680; App.329/R.516; App.347-48/R.674-75; App.854/R.2187; *see* App.358-59/R.746-47 (describing vandalism at nearby stores and buildings). Plus, employees at Home Depot and other companies *have* faced aggressive, violent customer confrontations over controversial political or social messages, including "Black Lives Matter" and "America Was Never Great." POB41-42.

That the New Brighton store avoided actual "workplace disruption" or violence is proof of Home Depot's prudent decisionmaking, RAB46, not a lack of cause for concern. Home Depot's apron policy easily survives *Darlington*'s balancing test as a general matter. And it was especially sensible to enforce that policy in the tense environment following Floyd's murder.

## II.    THE BOARD'S FIRST AMENDMENT ARGUMENTS FAIL

Forcing Home Depot to permit Bo's BLM display violates the First Amendment. Home Depot uses its iconic orange aprons as a "billboard" to communicate with customers: Home Depot emblazons the aprons with the company's logo and "Values Wheel," while also encouraging personalization that supports Home Depot's expressive aims, pursuant to the company's written apron

18

policy. POB4-7, 20-23; *see* RLC Amicus Br. 9-10. Bo added BLM to the apron to supplement Home Depot's message to customers, while speaking to them as Home Depot's representative at a Home Depot store. POB45. Bo's BLM message clearly interfered with "the communication [Home Depot] chose to make," and the First Amendment plainly protects Home Depot's "deci[sion] to exclude [the BLM] message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995).

The Board does not deny that Home Depot uses its iconic orange aprons to communicate with customers. It does not deny that strict scrutiny applies to any infringement on Home Depot's First Amendment rights. But the Board makes no attempt to satisfy that stringent test. Instead, the Board hangs its hat entirely on the argument that Home Depot's free-speech rights are not even *implicated* here. RAB47-49. That argument defies decades of precedent, including the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024).[3]

### A. *NetChoice* Confirms That The First Amendment Protects Home Depot's Apron Policy

1. After Home Depot filed its opening brief, the Supreme Court reiterated in *NetChoice* that "the First Amendment offers protection when an entity engaging in

---

[3] The AFL-CIO advances additional First Amendment arguments. Those are meritless too, but as the Board emphasizes, an "amicus cannot raise issues not raised by the parties." RAB20 n.3 (quoting *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 732 n.3 (8th Cir. 1986)).

19

expressive activity, *including compiling and curating others' speech*, is directed to accommodate messages it would prefer to exclude." 144 S. Ct. at 2401 (emphasis added). Relying heavily on *Hurley*, the Court held that when "social-media platforms" create millions of individualized "feeds" for users, the platforms combine "'multifarious voices' to create a distinctive expressive offering," one the First Amendment fully protects. *Id.* at 2405 (quoting 515 U.S. at 569).

Home Depot does something directly analogous with the company's aprons. Through its apron policy, Home Depot compiles (1) Home Depot-chosen messaging (the logo and "Values Wheel") and (2) employee-chosen displays that conform to Home Depot's content guidelines. Under *NetChoice*, Home Depot's choices about "third-party speech that will be included in or excluded from" its aprons constitutes "expressive activity of [Home Depot's] own." *Id.* at 2401-02. The First Amendment protects those expressive choices. *Id.*

2. The Board insists that Home Depot's decisions about what personalized displays may appear on company aprons "do[] not involve Home Depot's speech." RAB48. *NetChoice* forecloses that argument. The Board's order directly "interferes with [Home Depot's] editorial choices" by "ordering the excluded [BLM display] to be included." *NetChoice*, 144 S. Ct. at 2402.

The Board accuses Home Depot of "overstat[ing]" how carefully it controls personalized displays on company aprons. RAB53. Besides being factually

inaccurate, POB6-7, this quibble is legally irrelevant. "It 'is enough' for a compiler to exclude [a] handful of messages" as it sees fit, or "all but one." *NetChoice*, 144 S. Ct. at 2402. The First Amendment protects the most "'eclectic'"—even outright "'conflicting'"—compilations, and nothing changes even if Home Depot "includes most items [of third-party speech] and excludes just a few." *Id.* (quoting *Hurley*, 515 U.S. at 562). Home Depot has a First Amendment right to exclude whatever slogans it wishes, even as it allows a "wide variety" of other messages deemed consistent with its communicative goals. *Id.* Short of satisfying strict scrutiny, the Board has no constitutional power to second guess or override Home Depot's choices. POB55.

*NetChoice* also refutes the Board's theory that speech "misattribution is implausible here," because "customers likely would understand that the various messages worn by individual employees represent the employee's speech." RAB54-55. *NetChoice* itself recognized that social-media users "may well attribute to the platforms the messages that [countless third-party] posts convey *in toto*." 144 S. Ct. at 2406. That's true even though no one thinks that Facebook "supports the Minnesota Vikings" or "enjoys the television show *Futurama*," just because individual users identify themselves as fans in their posts. RAB50. Here, it is even clearer that Home Depot "'own[s]' the overall speech environment" created by its aprons, which convey Home Depot's affirmative messaging. *NetChoice*, 144 S. Ct.

21

at 2406.  That is presumably why the Board's witnesses—including Bo—all agreed that customers would hold Home Depot responsible for offensive statements on company aprons, even if handwritten by individual employees.  App.205/R.230; App.307/R.442.

In any event, *NetChoice* emphasized that the Supreme Court "has never hinged a compiler's First Amendment protection on the risk of misattribution." 144 S. Ct. at 2406.  What matters for "receiv[ing] First Amendment protection" is that Home Depot's decisions about "which third-party content [its aprons] will display" are "expressive choices."  *Id.*

*NetChoice* thus confirms the Board's error in relying on *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), and *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47 (2006).  "[T]he key fact in those cases," the Court explained, "was that the host of the third-party speech was not itself engaged in expression."  *NetChoice*, 144 S. Ct. at 2406.  The lack of expressive activity meant that "compelled access" to open physical spaces—a shopping mall in *PruneYard* and a law school campus in *FAIR*—for third-party speakers "did *not* affect the complaining party's own expression."  *Id.* at 2401; *see Wickersham v. City of Columbia*, 481 F.3d 591, 601 (8th Cir. 2007) (similar).  This case is totally different, because Home Depot plainly engages in expressive activity through its

22

decisions to allow—and disallow—particular messages on its aprons. *Supra* 18-22; *see* Cato Amicus Br. 9-10.[4]

3. If the Board is right that the First Amendment has no application here, then the government could force Home Depot to permit *any* employee-chosen message on company aprons. Home Depot would have no constitutional recourse, even if its aprons were used to, say, "espouse racism, Islamophobia, or anti-Semitism," "discourage the use of vaccines," or "advance false claims of election fraud." *NetChoice*, 144 S. Ct. at 2405. The Supreme Court rejected that untenable result in *NetChoice*. This Court should reject it here.

## B. *Janus* And *Wooley* Likewise Support Home Depot

The Board's order violates the First Amendment for two additional reasons. Under *Janus*, a BLM display on a Home Depot apron worn by a Home Depot employee communicating with Home Depot customers is *Home Depot's* speech. POB45-46. And under *Wooley v. Maynard*, 430 U.S. 705 (1977), Home Depot's aprons cannot be dragooned into disseminating someone else's ideological message. POB49-50. The Board cannot avoid these precedents either.

---

[4] Home Depot's engagement in expressive activity likewise refutes the Board's suggestion that Home Depot should disassociate itself from Bo's BLM display. RAB54-55. That "kind of forced response" is "antithetical" to the First Amendment. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986).

Appellate Case: 24-1513   Page: 29   Date Filed: 09/03/2024 Entry ID: 5431163

1. *Janus* instructs that "[w]hen an employee engages in speech that is part of the employee's job duties," the employee "speaks for" the employer. 585 U.S. at 910. That principle plainly applies to retail associates like Bo, whose primary responsibility is interacting with customers. By ordering Home Depot to allow Bo's customer-facing BLM display, the Board unconstitutionally forces Home Depot to convey that message. POB46.

The Board claims this key language from *Janus* is "not a holding." RAB50. But it was central to *Janus*'s reasoning: It was why the union there was "speak[ing] for the *employees*, not the employer," when the union "negotiate[d] with the employer or represent[ed] employees in disciplinary proceedings." 585 U.S. at 910. The Board also implies that *Janus*'s commonsense conclusion applies only to government employees. RAB50. *Janus* was clear, however, that this principle applies to employees "in both the public and private sectors." 585 U.S. at 909.

The Board misses the mark in citing *Amalgamated Transit Union Local 85 v. Port Authority of Allegheny County*, 39 F.4th 95 (3d Cir. 2022). RAB51. There, the Third Circuit concluded that BLM displays by government employees were unrelated to their non-customer-facing job duties. *Amalgamated Transit*, 39 F.4th at 103-04. Here, by contrast, Bo's retail role focused on interacting with customers. Home Depot thus had every right to "control[] the speech for which [Bo was] employed." *Id.* Indeed, Bo confirmed that the BLM display sought to convey a

24

message to Home Depot's customers, and Home Depot indisputably uses the aprons to convey such messages itself. *Supra* 5-9, 18-19.

2. Even spotting the Board its false premise that the only "speech at issue is Home Depot *employees'* speech," RAB48-49, Home Depot would still prevail under *Wooley*. Home Depot's iconic orange aprons cannot be conscripted into service as "mobile billboard[s]" for someone else's "ideological message." *Wooley*, 430 U.S. at 715; *see* POB49-50.

The Board protests that "employees are not 'mobile billboard[s]' for their employer." RAB50. That's true only as a literal matter. In reality, a Home Depot employee wearing a Home Depot apron serves as the living equivalent of a billboard, in every sense that matters under the First Amendment. Just like a billboard, the apron communicates Home Depot's chosen messaging to its customers. Home Depot thus has the right to control that expression and may "refuse to foster" employees' "ideological point[s] of view" on the aprons. *Wooley*, 430 U.S. at 715.

The Board says *Wooley* is distinguishable because there "the government itself crafted [the] message" at issue. RAB51. But no one thinks *Wooley* would have come out differently if the challenged statute had required drivers to display bumper stickers trumpeting a third party's chosen slogan, instead of license plates bearing the official state motto. *Wooley*, 430 U.S. at 707; *see* Cato Amicus Br. 11-12. Regardless, the Board's order requires Home Depot to allow Bo's BLM

25

display only because a federal statute—the NLRA—purportedly grants that particular message special protection. The order is not content neutral: It clearly "coerc[es] affirmance of a particular [NLRA-]favored viewpoint." RAB52. Such compelled speech is unconstitutional.

### C. The Board's "Decades Of Precedent" Argument Lacks Merit

The Board also argues that "decades of precedent" foreclose Home Depot's First Amendment defense. RAB47. That's wrong. The Board cannot cite a single case rejecting an employer's First Amendment argument in this context. Indeed, the Board acknowledges that no court has ever addressed—let alone rejected—Home Depot's First Amendment argument. *See id.* So much for "decades of precedent."

What the Board really means is that no court has ever had occasion to adjudicate the validity of Home Depot's position. That's only because the Board's expansive NLRA theory is so novel. Until now, the Board has never forced employers to accept controversial political and ideological messages on company uniforms. POB54. Given that (now-abandoned) restraint, it is unsurprising that defendants saw no need to invoke the First Amendment in prior cases.

The Board substantiates its "decades of precedent" claim almost exclusively with cases upholding—as a *statutory* matter—employee rights to display union insignia on the job. *See* RAB47. Those decisions are not dispositive here, because (1) this case does not involve union insignia, and (2) the Board's cases did not

26

discuss the First Amendment. While union insignia also implicate an employer's First Amendment rights, they raise different issues from generalized political or ideological slogans like BLM. After all, union insignia are more integral to the NLRA's core policy of protecting employee rights to unionize and bargain collectively. And such insignia—by their nature—clearly reflect the employee's affiliation and not the employer's. These same considerations distinguish the Board's hypothetical employee buttons advocating worker-friendly positions on collective-bargaining and wages. *See* RAB48.

In cases involving union insignia or the hypothetical buttons, the Board would presumably argue that the NLRA's protection of these messages satisfies strict scrutiny, because it (1) advances a compelling state interest in protecting workers' rights to unionize and bargain collectively, and (2) is narrowly tailored to that interest. POB55. A court would need to weigh those claims, carefully assessing the strength of the Board's asserted justification based on record evidence and relevant caselaw. The Board could prevail only if the court was convinced that the Board satisfied this "demanding standard," thus justifying the incursion on the defendant's First Amendment rights. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799-800 (2011).

Here, though, the Board conspicuously does not even *try* to satisfy strict scrutiny (or any other First Amendment test). By relying only on its claim that the

27

First Amendment is not implicated at all, RAB47-56, the Board has waived any claim that the NLRA is constitutional even if it restricts Home Depot's free-speech rights. *See United States v. Roberts*, 881 F.3d 1049, 1053 (8th Cir. 2018). So if the Court agrees that Home Depot has First Amendment interests at stake here—as it should—the Board loses this case.

## III.   THE BOARD'S CEASE-AND-DESIST ORDER IS TOO BROAD

The Board does not deny that its sweeping remedial order is an improper obey-the-law injunction. POB57. Nor does the Board assert any right to force Home Depot to allow employee BLM displays unrelated to the Gumm and vandalism incidents, at the New Brighton store or elsewhere. POB57-58 & n.7. Indeed, the Board completely ignores the merits of Home Depot's remedial argument. It has thus waived any substantive response. *See Roberts*, 881 F.3d at 1053.

The Board instead claims that Section 10(e) deprives this Court of jurisdiction to consider Home Depot's remedial argument, because Home Depot failed to seek reconsideration by the Board. RAB34 (citing 29 U.S.C. § 160(e)). But Section 10(e) is not jurisdictional, and a motion for "reconsideration or rehearing need not be filed to exhaust administrative remedies." 29 C.F.R. § 102.48(c)(3); *see Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 258 (5th Cir. 2024). In *AMCAR Division, ACF Industries, Inc. v. NLRB*, 596 F.2d 1344 (8th Cir. 1979), this Court long ago made clear that a party who prevails before the ALJ—and thus has "no cause to urge [a]

28

point before the Board" in its initial submissions—may nonetheless "properly raise th[at] issue before this Court." *Id.* at 1350 n.8; *accord NLRB v. Loc. 282, Int'l Bhd. of Teamsters*, 412 F.2d 334, 337 n.2 (2d Cir. 1969).  In *AMCAR*, that was true even though the employer failed to seek reconsideration by the Board.

*AMCAR* squarely governs here:  Because Home Depot prevailed before the ALJ, it had no basis to file exceptions challenging any unlawful remedial order to the Board.  In these circumstances, it was not required to seek reconsideration and may "properly raise th[at] issue before this Court."  596 F.2d at 1350 n.8.

The Board cites two post-*AMCAR* decisions purporting to require a reconsideration motion in arguably similar circumstances.  RAB56.  But those later decisions conflict with *AMCAR*.  And "when faced with conflicting panel opinions," this Court "must" follow "the earliest opinion"—*AMCAR*.  *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc).  In any event, the intra-circuit conflict at minimum presents an "extraordinary circumstance[]" justifying this Court's consideration of Home Depot's remedial challenge.  29 U.S.C. § 160(e).  Such consideration is especially warranted given the Board's total failure to defend its unlawful remedy on the merits.

Appellate Case: 24-1513   Page: 35   Date Filed: 09/03/2024 Entry ID: 5431163

## CONCLUSION

The Court should grant the petition and set aside—or, at minimum, modify— the Board's order.

Dated: August 30, 2024                     Respectfully submitted,

                                           */s/ Roman Martinez*

C. Thomas Davis                            Roman Martinez
Keith D. Frazier                           Brent T. Murphy
Brian E. Hayes                             Joseph E. Sitzmann
OGLETREE, DEAKINS, NASH,                   LATHAM & WATKINS LLP
SMOAK & STEWART, P.C.                      555 Eleventh Street, NW
401 Commerce Street                        Suite 1000
Suite 1200                                 Washington, DC 20004
Nashville, TN 37219                        (202) 637-2200
(615) 254-1900                             roman.martinez@lw.com

                                           Nicholas Rosellini
                                           LATHAM & WATKINS LLP
                                           505 Montgomery Street
                                           Suite 2000
                                           San Francisco, CA 94111
                                           (415) 391-0600

*Counsel for Petitioner/Cross-Respondent Home Depot U.S.A., Inc.*

30

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,500 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

Dated: August 30, 2024
                                          */s/ Roman Martinez*
                                          Roman Martinez

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2024, pursuant to Federal Rule of Appellate Procedure 25(a)(2)(A)(ii), I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit. Within five days of receipt of notice that the foregoing document has been filed, Petitioner/Cross-Respondent Home Depot U.S.A., Inc. will serve each party separately represented with a paper copy of the brief.

I further certify that ten paper copies of Reply Brief for Petitioner/Cross-Respondent Home Depot U.S.A., Inc. will be provided to the Court within five days after receipt of notice that the foregoing document has been filed pursuant to Rule 28A(d).

Joel Abraham Heller
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570

*Counsel for Respondent/Cross-Petitioner*
*National Labor Relations Board*


*/s/ Roman Martinez*
Roman Martinez